1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

ANDREW HARRIS ROUFA,

10

Plaintiff,

11

v.

12

DOW CONSTANTINE, et al.,

13

Defendants.

CASE NO. C15-1379JLR

ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT

14

15

## I.   INTRODUCTION

16

Before the court is Defendants' motion for summary judgment.[1]  (MSJ (Dkt.

17

# 12).)  The court has considered Plaintiff Andrew Harris Roufa's opposition to the

18

19

20

21

22

[1] Defendants in this action are identified in Mr. Roufa's complaint as follows: King
County; King County Executive Dow Constantine ("Executive Constantine"); Sergeant
Mohamed; Captains Allen, Clark, and Woodbury; Officers Wells, Allred, Hallock, Owens,
Grant, Van Der Vliet, Mendez, and Sprague; "Nurse Gabriella"; Carol Bryner; Major Hyatt;
Commander Karlsson; and the King County Department of Adult and Juvenile Detention
("DAJD").  (Compl. (Dkt. # 2-1) at 1.)  The court will refer collectively to Captains Allen, Clark,
and Woodbury, Major Hyatt, and Commander Karlsson as "Supervisory Defendants."  The court
will refer collectively to Officers Wells, Allred, Hallock, Owens, Grant, Van Der Vliet, Mendez,
and Sprague as Officer Defendants.

motion (Resp. (Dkt. # 28)), Defendants' reply memorandum (Reply (Dkt. # 32)), the relevant portions of the record, and the applicable law.  On January 5, 2017, the court also heard the argument of counsel.  (Min. Entry (Dkt. # 34).)  Being fully advised, the court GRANTS Defendants' motion for summary judgment for the reasons set forth below.

## II.   BACKGROUND

**A.   Defendants' Version of Events**

### 1.   Mr. Roufa's Arrest

This case arises from Mr. Roufa's arrest and booking into King County Jail[2] on June 9, 2012.  (*See* Compl. (Dkt. # 1-2) ¶¶ 1, 14, 22; MSJ at 1.)  Around 6:30 p.m. that evening, the Seattle Police Department ("SPD") received a call that a man was "acting bizarre[ly] in the area of 1st Avenue South & South Michigan Street."  (MSJ at 2 (citing 1st Zeldenrust Decl. (Dkt. # 24) ¶¶ 2-3, Ex. 1 ("1st Police Rep.") at 4, Ex. 2 ("2d Police Rep.").)  The police later identified this man as Mr. Roufa.  (*See* 1st Police Rep. at 1.)  During the time that Mr. Roufa was acting strangely, a Washington State Patrol ("WSP") trooper detained Mr. Roufa, and SPD Officer Thaimin Saewong responded to the scene.  (*See* 1st Police Rep.; 2d Police Rep.)

When Officer Saewong responded, Dora Smith "flagged [him] down" and told him that "the male [they] were looking for was her friend," Mr. Roufa.  (1st Police Rep. at 5.)  Ms. Smith told Officer Saewong that she was concerned about Mr. Roufa's mental

---

[2] King County Jail is a division of DAJD.  (*See* Compl. ¶ 2 ("The King County Jail is one jail that is run by the King County Department of Adult and Juvenile Detention.").)

health and that he had been diagnosed with paranoid schizophrenia and bipolar disorder. (*Id.* at 4-5; 2d Police Rep. at 6.)  Officer Saewong then checked whether Mr. Roufa had any outstanding warrants and determined that Mr. Roufa had "an active . . . warrant" from Seattle Municipal Court for domestic violence/harassment.  (1st Police Rep. at 5.)  Upon learning of the outstanding warrant, Office Saewong and his partner, Officer Suarez, arrested Mr. Roufa without incident.  (MSJ at 2 (citing 1st Police Rep. at 5).)

Once Mr. Roufa was in their police car, however, he became hostile.  (1st Police Rep. at 5.)  Mr. Roufa threatened to sue the officers, stated that "he wanted everything recorded," and indicated that "he thought [the officers] were going to beat him down." (*Id.*)  Mr. Roufa also threatened to assault the officers and said that "he wanted to get beat up by officers" and that "he would not cooperate" with them.  (*Id.*)  Officer Saewong received approval to book Mr. Roufa directly into King County Jail because of the hostile behavior.  (*Id.*)

After Mr. Roufa's arrest, Ms. Smith dialed 911 and said that Mr. Roufa had assaulted her, which Ms. Smith had not mentioned to Officer Saewong when they spoke. (2d Police Rep. at 6.)  Officer Saewong went to Ms. Smith's house to investigate the incident, and Ms. Smith told Officer Saewong that she and Mr. Roufa had dated for about three years and lived together, but that Mr. Roufa had recently been living in a motel and on the streets.  (*Id.*)  Mr. Roufa had been "kicked out of the Star Motel" and phoned Ms. Smith on June 9, 2012, to give him a ride.  (*Id.*)  Ms. Smith picked Mr. Roufa up in the Georgetown area of Seattle (*id.*), and Ms. Smith told Officer Saewong that Mr. Roufa began acting hostilely towards her, "tried [to] pick[] fights" with random strangers they

1    encountered, argued with her, and shoved her in the chest while she was driving (*id.*).

2    Ms. Smith then made Mr. Roufa get out of the car near 1st Avenue South in Seattle,

3    where Mr. Roufa ultimately encountered the WSP trooper.  (*Id.*; *see also* 1st Police Rep.

4    at 1.)

5         2.  Mr. Roufa's Booking into the King County Jail

6         When Mr. Roufa arrived at the King County Jail, he initially cooperated with the

7    corrections officers who put Mr. Roufa in a holding cell in the Intake, Transfer, and

8    Release ("ITR") section of the jail.  (1st Police Rep. at 4.)  However, by approximately

9    9:15 p.m., the corrections officers stopped taking pictures and fingerprints of Mr. Roufa

10   because he spit and screamed from his cell.  (Grant Decl. (Dkt. # 15) ¶ 2, Ex. 1 ("Grant

11   Rep.") at 2; Hallock Decl. (Dkt. # 16) ¶ 2, Ex. 1 ("Hallock Rep.") at 2; Mohamed Decl.

12   (Dkt. # 19) ¶ 2, Ex. 1 ("1st Mohamed Rep.") at 3.)  The officers "placed [Mr. Roufa] on

13   15[-]minute checks in anticipation of moving him to a different cell."  (1st Mohamed

14   Rep. at 3; *see also* Sprague Decl. (Dkt. # 20) ¶ 2, Ex. 1 ("Sprague Rep.") at 2.)

15        At this time, the second shift ITR sergeant, Abdulmonaiem Mohamed, contacted

16   the Acting Captain, Captain Allen, to report "the possible anticipated use of force" in

17   moving Mr. Roufa to a different cell.  (1st Mohamed Rep. at 3)  Captain Allen authorized

18   Sergeant Mohamed to "use reasonable and necessary force while dealing with [Mr.]

19   Roufa."  (*Id.*)  Sergeant Mohamed then directed Officer Kenneth Grant to contact Jail

20   Health Services Nurse Kimberly to see "if there [we]re any contraindications preventing

21   the use of pepper spray or [a] [t]aser on [Mr.] Roufa."  (*Id.*; Grant Rep. at 2.)  Officer

22   //

1 Grant told Sergeant Mohamed that "Nurse Kimberley" said there were no

2 contraindications.  (*Id.*; Grant Rep. at 2; Hallock Rep. at 2.)

3       Officer Grant and Officer Owens then directed Mr. Roufa to "approach the

4 pass-through of the holding cell door so he could be handcuffed" and moved to a

5 different cell.  (MSJ at 5 (emphasis omitted) (citing Grant Rep. at 2; 1st Mohamed Rep.

6 at 3; Hallock Rep. at 2).)  Mr. Roufa complied, and the officers moved him to a different

7 cell.  (Grant Rep. at 2.)  After Mr. Roufa entered the new cell, however, he pulled his

8 hands away from the officers and they were unable to remove the handcuffs.  (1st

9 Mohamed Rep. at 3; Hallock Rep. at 2.)  Sergeant Mohamed directed Mr. Roufa several

10 times to come to the pass-through to have the handcuffs removed, but Mr. Roufa

11 continued to refuse.  (1st Mohamed Rep. at 3.)  Sergeant Mohamed "warned [Mr.] Roufa

12 that he would deploy . . . pepper spray if [Mr.] Roufa did not comply with [Sergeant

13 Mohamed's] orders."  (1st Mohamed Rep. at 3.)  Mr. Roufa continued to refuse, and

14 Sergeant Mohamed sprayed the pepper spray into the cell.  (*Id.*; Mohamed Decl. ¶ 3, Ex.

15 2 ("2d Mohamed Rep.") at 1; *see also* Allred Rep. at 2.)  Two cans of pepper spray failed

16 to deploy correctly.  (1st Mohamed Rep. at 3; *see also* Clark Decl. (Dkt. # 14) ¶ 2, Ex. 1

17 ("Clark Rep.") at 2.)  From a "partially full" third can and a fourth can, Sergeant

18 Mohamed "sprayed several bursts [that] struck [Mr.] Roufa on the back."  (2d Mohamed

19 Rep. at 2.)  After each time he sprayed, Sergeant Mohamed directed Mr. Roufa to come

20 to the pass-through, but Mr. Roufa refused.  (*Id.*; *see also* 1st Mohamed Rep. at 3.)

21 Sergeant Mohamed "then sprayed the pepper spray into [Mr.] Roufa's face," but Mr.

22 //

1    Roufa "still refused to comply and ran around inside his cell." (MSJ at 5 (citing 2d

2    Mohamed Rep. at 2); *see also* Grant Rep. at 2.)

3         Sergeant Mohamed then "directed several corrections officers to suit up for a cell

4    extraction." (MSJ at 5 (citing 2d Mohamed Rep. at 2); *see also* Grant Rep. at 2; Hallock

5    Rep. at 2.) Officer Sprague checked with the jail's psychiatric nurse—"Nurse

6    Gabriella"—to see whether a taser could be used on Mr. Roufa. (2d Mohamed Rep. at 2.)

7    The nurse told Officer Sprague that a taser could not be used because the nurse concluded

8    that Mr. Roufa had a heart condition based on the medicine he was taking. (2d Mohamed

9    Rep. at 2; Sprague Rep. at 2; Mohamed Decl. ¶ 4, Ex. 3.) After learning that Mr. Roufa

10   could not be tased, Sergeant Mohamed decided to "transfer [Mr.] Roufa to a different cell

11   so that he could decontaminate." (2d Mohamed Rep. at 2.) Captain Allen told Sergeant

12   Mohamed to use a video camera during the move. (*Id.*)

13        While Sergeant Mohamed made these arrangements, another officer removed Mr.

14   Roufa's handcuffs, after which Mr. Roufa removed all of his clothes. (Grant Rep. at 2;

15   Van Der Vliet Decl. (Dkt. # 21) ¶ 2, Ex. 1 ("Van Der Vliet Rep.") at 2 ("I uncuffed the

16   inmate through the pass through without incident.").) Mr. Roufa "was having [a] hard

17   time dealing with the effect of pepper spray." (2d Mohamed Rep. at 2.) Around 9:30

18   p.m., Mr. Roufa stated that he would comply with officers, and Sergeant Mohamed

19   directed Officers Allred and Van Der Vliet to move Mr. Roufa to another cell so that Mr.

20   Roufa could decontaminate. (*See* 2d Mohamed Rep. at 2; Allred Rep. at 2.) The officers

21   moved Mr. Roufa without further incident. (Grant Rep. at 2; Van Der Vliet Rep. at 2.)

22   //

1    When Sergeant Mohamed came to the new cell "[a] short time later," Mr. Roufa

2 told Sergeant Mohamed that the pepper spray still burned his body, particularly his

3 genitals.  (2d Mohamed Rep. at 2.)  Sergeant Mohamed agreed to let Mr. Roufa

4 "decontaminate in the day-room shower, provided that he returned to his cell

5 immediately" after he finished showering, to which Mr. Roufa agreed.  (MSJ at 6; *see*

6 *also* 2d Mohamed Rep. at 2.)  Officers Sprague and Mendez disagreed with Sergeant

7 Mohamed's decision, telling him that "it was unwise to allow an agitated psychiatric

8 inmate to access the dayroom" and that the "proper procedure . . . was to allow the inmate

9 to use his cell sink for decontamination."  (MSJ at 7; Sprague Rep. at 2; Mendez Decl.

10 (Dkt. # 18) ¶ 2, Ex. 1 ("Mendez Rep.") at 2.)  Sergeant Mohamed, however, believed that

11 Mr. Roufa had calmed down and should be allowed to fully decontaminate in the shower.

12 (2d Mohamed Decl. at 2; *see also* Mendez Rep. at 2.)

13    3.  <u>The Dayroom Incident</u>

14    Mr. Roufa showered in the dayroom, but refused to return to his cell.  (2d

15 Mohamed Rep. at 2; Allred Rep. at 2; Grant Rep. at 2; Hallock Rep. at 2; Mendez Rep. at

16 2; Van Der Vliet Rep. at 2.)  Instead, he "ran naked from one end of the dayroom to the

17 other, yelling incoherently and acting in an erratic and combative manner."  (MSJ at 7

18 (citing 2d Mohamed Rep. at 2; Allred Rep. at 2; Grant Rep. at 2; Hallock Rep. at 2;

19 Mendez Rep. at 2; Van Der Vliet Rep. at 2).)  Sergeant Mohamed directed Mr. Roufa to

20 return to his cell several times, but Mr. Roufa did not comply.  (2d Mohamed Rep. at 2.)

21 Mr. Roufa ran into his cell at one point, but came out into the dayroom again before the

22 officers could secure him inside.  (*Id.*; Allred Rep. at 2; Van Der Vliet Rep. at 2.)

1   Sergeant Mohamed warned Mr. Roufa that he would use the pepper spray again if Mr.

2   Roufa did not return to his cell.  (2d Mohamed Rep. at 2.)

3        At about 9:45 p.m., Captain Woodbury and two other sergeants came to the

4   dayroom to help with the situation.  (*Id.* at 3; Van Der Vliet Rep. at 3; Grant Rep. at 2.)

5   Captain Woodbury decided that the officers would not use any more pepper spray on Mr.

6   Roufa, and because the officers believed they could not use a taser, Sergeant Mohamed

7   "directed a number of officers to assemble and form an extraction team" that included

8   Officers Wells, Allred, Hallock, Owens, and Grant.  (2d Mohamed Rep. at 3.)  At 9:49

9   p.m., Captain Woodbury authorized Sergeant Mohamed to direct the extraction team to

10  enter the dayroom, even though the video camera had not yet arrived on the scene.  (2d

11  Mohamed Rep. at 3; *see also* Van Der Vliet Rep. at 3 ("I was part of the second wave of

12  Officers that entered the dayroom . . . .").)  By this time, Mr. Roufa had gone back into

13  the bathroom of the dayroom.  (2d Mohamed Rep. at 3.)

14        4.  Extraction from the Dayroom

15        Officers Allred, Hallock, Grant, and Wells entered the dayroom with Officer

16  Wells leading with a shield.  (Allred Rep. at 2; Grant Rep. at 3; Hallock Rep. at 2; Wells

17  Decl. (Dkt. # 22) ¶ 2, Ex. 1 ("Wells Rep.") at 2; *see also* 2d Mohamed Rep. at 3.)  Officer

18  Wells "struck [Mr.] Roufa with the flat part of the shield to pin [Mr. Roufa] against the

19  wall," and Mr. Roufa collapsed.  (MSJ at 8; *see also* Wells Rep. at 2 ("I did cut my ring

20  [finger] on my left hand from the impact of the shield hitting the inmate.").)  Officer

21  Allred pulled Mr. Roufa out of the bathroom into the dayroom by "secur[ing] [his] left

22  arm."  (Allred Rep. at 2.)  Mr. Roufa attempted to stand up, but the officers took him "to

1   the ground" and placed him "on his stomach." (Hallock Rep. at 2.) As the officers

2   ordered Mr. Roufa "to stop resisting and put his hands behind his back," Mr. Roufa

3   struggled "and kept his arms under his body." (*See* MSJ at 9.) The officers used their

4   bodyweight on top of Mr. Roufa to keep him on the ground. (*See* Grant Rep. at 3.) Mr.

5   Roufa continued to struggle against the officers' attempts to secure Mr. Roufa's arms

6   with handcuffs. (*See* Hallock Rep. at 2; Allred Rep. at 2; Grant Rep. at 3.) Officer

7   Allred "used approximately three closed fist strikes to the shoulder/tricep area" to stop

8   Mr. Roufa from resisting. (Allred Rep. at 2; *see also* Grant Rep. at 2).) Officer Allred

9   was then able to handcuff Mr. Roufa. (Allred Rep. at 2.)

10         After the officers handcuffed Mr. Roufa, they saw that he was bleeding

11   significantly from his left eyebrow. (*Id.*; Grant Rep. at 3.) Nurse Gabriella told Sergeant

12   Mohamed that Mr. Roufa needed to go to the hospital, and the officers secured Mr. Roufa

13   in the dayroom until an ambulance arrived around 10:30 p.m. to escort Mr. Roufa. (2d

14   Mohamed Rep. at 3.)

15         5. Mr. Roufa's Injury

16         Hospital staff diagnosed Mr. Roufa with a five-centimeter laceration above his left

17   eye. (1st Zeldenrust Decl. ¶ 5, Ex. 4 at 3.) Staff gave Mr. Roufa a CT scan, which

18   showed no "intracranial bleeding or pathology" (*id.* at 4), and thought that Mr. Roufa's

19   behavior was consistent with a manic episode (*id.* at 5). After he received treatment for

20   his injury, Mr. Roufa returned to the King County Jail by 5:00 a.m. on June 10, 2012.

21   (*See* MSJ at 9.)

22   //

1

6.  The Investigation

2

Following the incident with Mr. Roufa, Captain Woodbury investigated the

3

events pursuant to the jail's Use of Force policy.  (*See* Clark Decl. (Dkt. # 14), ¶ 2, Ex. 1

4

("Clark Rep.") at 2; Hyatt Decl. (Dkt. # 17) ¶ 4, Ex. 2 at 3.)[3]  The investigation focused

5

on three issues:  (1) that Sergeant Mohamed allowed Mr. Roufa to leave his cell to

6

shower in the dayroom when Mr. Roufa could have decontaminated in his cell; (2) that

7

Officers Mendez and Sprague acted inappropriately "in challenging Sergeant Mohamed's

8

order to allow [Mr.] Roufa out of his cell to use the dayroom shower"; and (3) that Nurse

9

Gabriella provided inaccurate information about whether the officers could use a taser on

10

Mr. Roufa.  (*See* MSJ at 11; Clark Rep. at 2-3.)  Captain Woodbury determined that

11

Sergeant Mohamed "could have made 'better choices'" regarding the decontamination.

12

(*Id.*)  Another captain, Captain Todd Clark, spoke with Officers Mendez and Sprague and

13

counseled them that their challenge to Sergeant Mohamed was inappropriate.  (*Id.*)  The

14

investigation further revealed that Nurse Gabriella had misinformed the officers about

15

contraindications for using a taser on Mr. Roufa.  (Hyatt Decl. ¶ 2, Ex. 1 at 3; 1st

16

Zeldenrust Decl. ¶ 4, Ex. 3; *see also* Mohamed Decl. ¶ 4, Ex. 3.)  Nurse Gabriella had

17

"noted that [Mr. Roufa] was on a medication that could be used for both seizures and

18

behavior" and thought that Mr. Roufa could not be tased.  (Hyatt Decl. ¶ 2, Ex. 1 at 3; 1st

19

Zeldenrust Decl. ¶ 4, Ex. 3; *see also* Mohamed Decl. ¶ 4, Ex. 3.)  When she reviewed his

20

---

[3] Defendants also submit Captain Woodbury's declaration in support of their motion. (*See* Woodbury Decl. (Dkt. # 23).)  However, Captain Woodbury did not sign his declaration, so the court does not consider it.  *See United States v. Godfrey*, Cr. No. S-10-117 KJM, 2014 WL 1419428, at *1 (E.D. Cal. Apr. 11, 2014) (collecting cases in which courts rejected an unsigned declaration submitted in connection with a motion for summary judgment).

21

22

1   chart again, however, after the ambulance arrived, Nurse Gabriela "determined that [Mr.

2   Roufa] was on the medication for behavior only." (MSJ at 11 (citing Zeldenrust Decl.,

3   ¶ 4, Ex. 3 at 2-3).)

4         In July 2012, Major Corinna Hyatt reviewed the results of the investigation. (*See*

5   *generally* Hyatt Decl.) She followed up with Captain Clark and Sergeant Mohamed to

6   convey her concern about Sergeant Mohamed's decision to let Mr. Roufa leave his cell

7   and the amount of force the officers had used to subdue him once he refused to be

8   handcuffed and leave the dayroom. (*Id.* ¶ 2, Ex. 1 at 3.) Major Hyatt concluded that the

9   use of the extraction team was "excessive" and that it would have been better to leave

10  Mr. Roufa to de-escalate because Mr. Roufa had not actually threatened anyone while he

11  was in the dayroom. (*Id.*)

12  **B.    Mr. Roufa's Version of Events**

13        Mr. Roufa agrees that he has bipolar disorder "with psychotic features/

14  schizoaffective tendencies" and explains that he "lives on Social Security Disability

15  income on account of his mental health disability." (Resp. at 2 (citing Altaras Decl. (Dkt.

16  # 29) ¶ 2, Ex. A ("Roufa Dep.") at 13).) Mr. Roufa was arrested and held at the King

17  County Jail at least four times before the June 9, 2012, incident that gives rise to this

18  lawsuit. *Id.* (citing Altaras Decl. ¶ 2, Exs. B, C).) Thus, Mr. Roufa contends that he was

19  "well known to the officers assigned to the 7th floor of the King County Jail—the mental

20  health unit." (*Id.* (citing Altaras Decl. ¶ 2, Exs. B, C).)

21        Mr. Roufa further agrees that he was experiencing a mental health episode at the

22  time of his arrest, but his version of the facts deviate from Defendants' version beginning

1    when Mr. Roufa first changed cells.  (*See* Roufa Dep.)  He concedes that he was verbally

2    aggressive, but denies being physically aggressive.  (*Id.* at 23-28; Altaras Decl. ¶ 2, Ex. D

3    ("Claim Form") at 2.)  Mr. Roufa states that he was transported to the Psychiatric Ward

4    of the jail on the Seventh Floor without incident, but that when Officers Grant and Owens

5    directed Mr. Roufa to put his hands through the pass-through to have the handcuffs

6    removed, "[t]he officers were so rough with Mr. Roufa's wrists that Mr. Roufa's wrist

7    began to hurt" and he "pulled his cuffed hands back into the cell and refused to put them

8    back on."  (Resp. at 3 (citing Roufa Dep. at 23-28; Claim Form at 2).)  He says he refused

9    because he was in pain and did not want the officers to further hurt his wrists.  (Roufa

10   Dep. at 29-31.)

11        Mr. Roufa contends that Sergeant Mohamed directed him to return to the

12   pass-through and that when he turned around, he was "immediately sprayed with not only

13   one, but four large canisters of pepper spray."  (Resp. at 3 (citing to Grant Decl., Mendez

14   Decl., and Sprague Decl.).)  Mr. Roufa states that he "was in horrible discomfort."  (*Id.*

15   (citing Altaras Decl. ¶ 2, Ex. F ("2016 DAJD Pepper Spray Policy")).)  Mr. Roufa does

16   not dispute that he was then removed to the dayroom to decontaminate in the shower, but

17   argues that once he was in the day room he acted as though anyone would be expected to

18   after being pepper sprayed.  (Roufa Dep. at 43.)  Specifically, "he ran through the room

19   because the cold air eased his pain, and he doused himself with cold water from the toilet

20   because the hot water from the shower exacerbated his pain."  (Resp. at 4 (citing Roufa

21   Dep. at 43).)

22   //

1    Mr. Roufa's account of events differs most significantly from the Defendants'

2    account when it comes to the extraction team's actions.  (*See generally* Roufa Dep. at

3    43-47; *compare* MSJ, *with* Resp.)  Mr. Roufa contends that the officers punched him and

4    that Sergeant Mohamed repeatedly pushed his foot into Mr. Roufa's back, cutting off Mr.

5    Roufa's air supply.  (*See* Roufa Dep. at 45-47:2-3, 12-14.)  Mr. Roufa received stitches

6    for the cut and contends that he has permanent scarring above his eyebrow and that he

7    "suffered pain and bruising for nearly a month after the incident."  (Resp. at 5 (citing

8    Roufa Dep. at 50-52; Altaras Decl. ¶ 2, Ex. H (jail records for Mr. Roufa after the

9    incident); Zeldenrust Decl., Ex. 4; Altaras Decl. ¶ 2, Ex. E (Mr. Roufa's psychiatric

10   records for June 10, 2012).)  Mr. Roufa also testifies that he suffers extreme

11   post-traumatic stress disorder and emotional distress from the incident.  (Roufa Dep. at

12   90-91, 99-104.)

13   When Mr. Roufa returned to King County Jail, officers cited him for an infraction

14   and placed him in solitary confinement for several days as punishment.  (Altaras Decl.

15   ¶ 2, Ex. I.)  The infraction report did not mention that he was suffering a mental health

16   episode at the time of his arrest.  (*Id.*)  On June 11, 2012, disciplinary hearing staff

17   "found that Mr. Roufa was not competent to commit any violation" and "specifically

18   [found] that Mr. Roufa could not control his own behavior at the time of the

19   incident . . . ."  (Resp. at 5 (citing Altaras Decl. ¶ 2, Ex. I).)

20   Mr. Roufa states that King County Jail did not have any "department policies

21   regarding dealing with the accommodation of mental health patients until after this

22   incident."  (Resp. at 7 (citing Altaras Decl., Exs. K ("DAJD Policy Index"), L ("2016

1    DAJD Inmate Disability Policy").)  Mr. Roufa also states that Major Hyatt and Captain

2    Woodbury's investigations "endorsed" the officers' actions because they determined that

3    the officers and Sergeant Mohamed had not violated any policies or procedures.  (*Id.* at

4    6-7.)

5    **C.    This Lawsuit**

6           Mr. Roufa asserts six state law claims and two federal claims.  (Compl. ¶¶ 40-57.)

7    Specifically, Mr. Roufa alleges a 42 U.S.C. § 1983 claim against all Defendants in their

8    official capacities for excessive force in violation of the Fourth and Fourteenth

9    Amendments (*id.* ¶ 40-42); a 42 U.S.C. § 1983 claim against King County, Executive

10   Constantine, DAJD, and Supervisory Defendants for failure to train and inadequate

11   supervision in violation of the Fourth and Fourteenth Amendments (*id.* ¶¶ 43-45);

12   negligent supervision and retention against Supervisory Defendants (*id.* ¶¶ 46-49);

13   battery (*id.* ¶¶ 50-51); intentional infliction of emotional distress ("IIED") (*id.* ¶ 52);

14   negligent infliction of emotional distress ("NIED") (*id.* ¶ 53); disability discrimination

15   under Washington's Law Against Discrimination ("WLAD"), ch. RCW 49.60 (*id.*

16   ¶¶ 54-55); and "respondeat superior" (*id.* ¶¶ 56-57).[4]  Defendants now seek summary

17   judgment on those claims.  (*See generally* MSJ.)

18   //

19   //

20

21   [4] Mr. Roufa does not make clear against which Defendants he alleges his claims of battery, IIED,
     NIED, disability discrimination, and respondeat superior.  (*See id.* ¶¶ 50-57.)  The court need not

22   conclusively rule on this issue, however, because the court finds that these claims fail as a matter
     of law no matter which Defendants Mr. Roufa asserts the claims against.  *See infra* §§ III.C-G.

1        ### III.   ANALYSIS

2   **A.   Legal Standard**

3        Summary judgment is appropriate if the evidence shows "that there is no genuine

4   dispute as to any material fact and the movant is entitled to judgment as a matter of law."

5   Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v.*

6   *Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  A fact is "material" if it might affect the

7   outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A

8   factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact

9   finder to find for the non-moving party."  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986,

10  992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

11       The moving party bears the initial burden of showing there is no genuine dispute

12  of material fact and that the movant is entitled to prevail as a matter of law.  *Celotex*, 477

13  U.S. at 323.  If the moving party does not bear the ultimate burden of persuasion at trial,

14  it can show the absence of a dispute of material fact in two ways:  (1) by producing

15  evidence negating an essential element of the nonmoving party's case, or (2) by showing

16  that the nonmoving party lacks evidence of an essential element of its claim or defense.

17  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  If the

18  moving party meets its burden of production, the burden then shifts to the nonmoving

19  party to identify specific facts from which a fact finder could reasonably find in the

20  nonmoving party's favor.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 252.

21       The court is "required to view the facts and draw reasonable inferences in the light

22  most favorable to the [non-moving] party."  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

ORDER - 15

1   The court may not weigh evidence or make credibility determinations in analyzing a

2   motion for summary judgment because these responsibilities are "jury functions, not

3   those of a judge." *Anderson*, 477 U.S. at 249-50.  Nevertheless, the nonmoving party

4   "must do more than simply show that there is some metaphysical doubt as to the material

5   facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find

6   for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380

7   (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio*

8   *Corp.*, 475 U.S. 574, 586-87 (1986)).  Accordingly, "mere allegation and speculation do

9   not create a factual dispute for purposes of summary judgment," *Nelson v. Pima Cmty.*

10  *Coll.*, 83 F.3d 1075, 1081-81 (9th Cir. 1996), and "[a] trial court can only consider

11  admissible evidence in ruling on a motion for summary judgment," *Orr v. Bank of Am.,*

12  *NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).

13          The court first addresses Mr. Roufa's state law claims and then turns to his federal

14  law claims.

15  **B.      Negligent Supervision and Retention**

16          "[N]egligent supervision and training" occurs when an employer "fail[s] to

17  exercise ordinary care in supervising an employee." *Evans v. Tacoma Sch. Dist. No. 10*,

18  380 P.3d 553, 563-64 (Wash. Ct. App. 2016).  Liability for negligent supervision and

19  training "arises when the employer knows or has reason to know that the employee

20  presented a risk of danger to others." *Id.* at 564.  In addition, "Washington cases have

21  generally held that an employer is not liable for negligent supervision of an employee

22  unless the employer knew, or in the exercise of reasonable care should have known, that

1    the employee presented a risk of danger to others." *Niece v. Elmview Grp. Home*, 929

2    P.2d 420, 426 (Wash. 1997).  "A successful negligent retention claim imposes liability on

3    the employer for his or her own negligence in retaining an unfit employee." *Peoples v.*

4    *Puget Sound's Best Chicken!, Inc.*, 345 P.3d 811, 815 n.5 (Wash. Ct. App. 2015).

5        "These claims arise when the employee is acting outside the scope of

6    employment." *Evans*, 380 P.3d at 564.  An employee acts outside the scope of his

7    employment when his "conduct involv[es] the employee's 'wholly personal motive' and

8    'solely personal objectives or desires.'" *Id.* at 559 (quoting *Thompson v. Everett Clinic*,

9    860 P.2d 1054, 1058 (Wash. Ct. App. 1993)).  Accordingly, such claims are rooted in

10   "the employer's *own* negligence[,] [which] is a wrong to the injured party, independent

11   from the employer's liability for its employee's negligence imputed by the doctrine of

12   respondeat superior." *Id.* at 564.

13       Defendants argue that Mr. Roufa's claim against Supervisory Defendants for

14   negligent supervision and retention fails because all of the Defendants acted within their

15   scope of employment during the June 9, 2012, incident at King County Jail.  (MSJ at 13.)

16   Defendants further "admit that all individually[] named defendants were acting in the

17   scope of their employment" and therefore Mr. Roufa's negligent supervision and

18   retention claim fails as a matter of law.  (*Id.*)

19       Mr. Roufa does not address this claim in his response to Defendants' motion.  (*See*

20   *generally* Resp.)  Although the court may not consider a party's failure to oppose an

21   argument on summary judgment as an admission that the argument has merit, the court

22   may conclude that the claims fail as a matter of law where Mr. Roufa provides no

1  evidence in support of his claims once Defendants show a lack of evidence or negate an

2  essential element of the claim.  *See Nissan Fire*, 210 F.3d at 1106 (noting that the moving

3  party can demonstrate the lack of a dispute of material fact by showing a lack of evidence

4  or negating an element of the claim).

5       The court agrees that Mr. Roufa's claim fails.  The evidence before the court

6  demonstrates that all of the named Defendants who Mr. Roufa contends were negligently

7  supervised and retained acted within the scope of their employment during the June 9,

8  2012, incident.  (*See, e.g.*, Hyatt Rep. (failing to note any acts outside scope of

9  employment); *see also* Compl. ¶ 20 ("At all times relevant to Andrew Harris Roufa's

10  allegations in this Complaint, all defendants acted with the scope and authority of their

11  employment with [DAJD].").)  Nothing in the record suggests that the employees over

12  whom Supervisory Defendants exercised authority acted outside the scope of their

13  employment—that is, for a "personal motive" or to advance their "personal objectives."

14  *Thompson*, 860 P.2d at 1058.  For this reason, the court grants Defendants' motion for

15  summary judgment on Mr. Roufa's claim against Supervisory Defendants for negligent

16  supervision and retention.

17  **C.    Battery**

18       "A battery is 'an intentional and unpermitted contact with the plaintiff's person.'"

19  *Swank v. Valley Christian Sch.*, 374 P.3d 245, 256 (Wash. Ct. App 2016) (quoting *Kumar*

20  *v. Gate Gourmet, Inc.*, 325 P.3d 193, 204 (Wash. 2014)).  Washington law bars a plaintiff

21  //

22  //

1   from bringing a cause of action for battery more than two years after the alleged battery.[5]

2   *See* RCW 4.16.100 (stating that "[a]n action for . . . assault and battery" must be brought

3   "[w]ithin two years"); *see also Swank*, 374 P.3d at 256 ("[B]attery . . . is barred by the

4   two-year statute of limitations.").  Washington law also precludes a plaintiff from filing a

5   lawsuit against a local governmental entity and its agents for tortious conduct for 60 days

6   after a plaintiff serves the entity with a claim for damages.  *See* RCW 4.96.020(4) ("No

7   action subject to the claim filing requirements of this section shall be commenced . . . for

8   damages arising out of tortious conduct until sixty calendar days have elapsed after the

9   claim has first been presented to the agent of the governing body thereof.  The applicable

10   period of limitations within which an action must be commenced shall be tolled during

11   the sixty calendar day period.").

12        Defendants argue that Mr. Roufa's battery claim fails as a matter of law because

13   Washington's two-year statute of limitations bars it.  (MSJ at 14.)  Specifically, they

14   argue that Mr. Roufa alleges in his complaint that "because he was incarcerated at the

15   time of this incident, the statute of limitations did not commence until his release [from

16   jail] on September 13, 2012."  (*Id.* at 14-15 (citing Compl. at 5).)  Defendants assume

17   that Mr. Roufa's timeline for the statute of limitations to start running on his battery

18   claim is correct.  (*Id.* at 15.)  They argue that the statute of limitations expired by the end

19   of November 2014, assuming the period started on the date Mr. Roufa alleges in his

20

21        [5] State-law claims of battery against police officers are subject to the two-year limitations
     period, even though Washington's three-year statute of limitations for personal injury suits
     applies to claims under 42 U.S.C. § 1983.  *See Southwick v. Seattle Police Officer John Doe #s
22   1-5*, 186 P.3d 1089, 1092 (Wash. Ct. App. 1998).

1    complaint and takes into account the 60-day tolling period.  (*Id.*)  Mr. Roufa does not

2    dispute Defendants' assertion that his battery claim is time-barred and provides no

3    evidence to rebut Defendants' showing.[6]  (*See generally* Resp.)

4          The court agrees that Mr. Roufa's battery claim is time-barred.  Mr. Roufa filed

5    his claim for damages with King County on May 29, 2015 (Claim Form at 2), and

6    subsequently filed this lawsuit on July 31, 2015 (*see* Compl. at 1).  Mr. Roufa therefore

7    asserted his battery claim several months after the statute of limitations had run.  (*See*

8    *id.*); RCW 4.16.100.  Mr. Roufa's battery claim fails as a matter of law because he filed it

9    well after the applicable statute of limitations expired.

10   **D.    Intentional Infliction of Emotional Distress**

11          "In order to [establish] a prima facie case of [IIED], a plaintiff seeking to survive

12   summary judgment must produce evidence showing three elements: (1) extreme and

13   outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3)

14   actual result to the plaintiff of severe emotional distress."  *Christian v. Tohmeh*, 366 P.3d

15   16, 30 (Wash. Ct. App. 2015).  "Extreme and outrageous conduct must be conduct that

16   the recitation of the facts to an average member of the community would arouse his

17   resentment against the actor and lead him to exclaim 'Outrageous!'"  *Id.* (internal

18   quotation marks omitted).  Therefore, "[c]onduct must go 'beyond all possible bounds of

19   decency, and to be regarded as atrocious, and utterly intolerable in a civilized

20   //

21   _____

22         [6] Mr. Roufa's counsel admitted at oral argument that Mr. Roufa's battery claim is barred
     by the two-year statute of limitations.  (*See* Min. Entry.)

1   community.'"  *Monetti v. City of Seattle*, 875 F. Supp. 1221, 1231 (W.D. Wash. 2012)

2   (quoting *Grimsby v. Samson*, 530 P.2d 291, 295 (Wash. 1975)).

3        The three elements present questions of fact, but under Washington law, courts act

4   as "gatekeepers" for the first element and determine whether the alleged conduct is

5   sufficiently outrageous for the IIED claim to go to the jury.  *Id.* ("Washington

6   courts . . . have considered themselves gatekeepers for purposes of allowing a jury to

7   decide claims of [IIED].  The trial court . . . renders an initial screening to determine

8   whether the defendant's conduct and mental state, together with the plaintiff's mental

9   distress, rise to the level necessary to make out a prima facie case."); *see also Robel v.*

10  *Roundup Corp.*, 59 P.3d 611, 619 (Wash. 2002) ("This first element of the test goes to

11  the jury only after the court determine[s] if reasonable minds could differ on whether the

12  conduct was sufficiently extreme to result in liability." (internal quotation marks omitted)

13  (alteration in original)).  Courts determine whether reasonable minds could differ in

14  concluding that the alleged conduct is so extreme as to impose liability.  *See id.*

15        Defendants argue that Mr. Roufa's IIED claim fails as a matter of law because the

16  conduct Mr. Roufa alleges is not sufficiently extreme to go to the jury.  (MSJ at 15; *see*

17  *also* Reply at 6 (arguing that "none of [Mr.] Roufa's [r]esponse [b]rief allegations appear

18  in his [c]omplaint in connection with his [o]utrage claim").)  Mr. Roufa contends that

19  "[i]t was extreme and outrageous for [the] officers to completely disregard [his]

20  established medical mental health condition, of which they were or should have been

21  aware."  (Resp. at 14.)  Mr. Roufa further asserts that "empty[ing] four industrial

22  canisters of mace into his one[-]man cell, where he was secured, alone, in handcuffs" and

1    putting him in solitary confinement as punishment for his mental health condition

2    amounts to outrageous conduct.  (*Id.*)  In addition, although he does not argue these facts

3    specifically in regard to his IIED claim, Mr. Roufa provides the court with his deposition

4    testimony, in which he testifies that Sergeant Mohamed repeatedly stepped on his back

5    and cut off his air supply and kicked him in the back of the head once.  (*See* Roufa Dep.

6    at 45:2-3, 12:14, 47.)

7         Although the behavior Mr. Roufa describes in his deposition could present a

8    triable question of fact, "summary judgment is not a procedural second chance to flesh

9    out inadequate pleadings."  *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989,

10   992 (9th Cir. 2006).  Where a plaintiff "fail[s] to assert any factual allegations in its

11   complaint" to support a theory or claim, the plaintiff's "provision of affidavits and

12   declarations supporting [that theory or claim] at the summary judgment stage is

13   ineffectual."  *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624

14   F.3d 1083, 1088-89 (9th Cir. 2010).  Indeed, courts routinely decline to consider evidence

15   proffered in response to a motion for summary judgment when the evidence is untethered

16   from the factual allegations made in the complaint.  *See id.*; *In re TFT-LCD (Flat Panel)*

17   *Antitrust Litig.*, No. M 07-1827 SI, 2012 WL 5411590, at *2 (N.D. Cal. Nov. 6, 2012);

18   *Edinger v. City of Westminster*, No. SA CV 14-0145-DOC (RNB), 2015 WL 8770002, at

19   *7 (C.D. Cal. Dec. 14, 2015) ("Because these allegations [of retaliatory speech] have not

20   been properly pleaded, they are not properly before the Court" in response to a motion for

21   summary judgment."); *Corona v. Time Warner Cable, Inc.*, No. CV 13-5521 PSG

22   (VBKx), 2014 WL 11456535, at *4 (C.D. Cal. Oct. 16, 2014) (finding that the plaintiff's

1    complaint did not encompass the theory raised in response to a motion for summary

2    judgment).  When a complaint fails to contain factual allegations later raised in

3    opposition to a motion for summary judgment, the defendant may not have fair notice of

4    "'the grounds upon which [the plaintiff's claim] rests." *TFT-LCD Antitrust Litig.*, 2012

5    WL 5411590, at *2 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) and

6    declining to consider breach of a contract other than the purchase orders identified in the

7    complaint in response to a motion for summary judgment because the complaint did not

8    give the defendant fair notice).  The rationale for this rule rests primarily on the threat of

9    prejudice from a late change in the plaintiff's theory, but the court need not make a

10   finding of prejudice to reject a plaintiff's new theory.  *See id.* (rejecting argument based

11   on factual allegations not in complaint without making a finding of prejudice); *City of*

12   *Lake Forest*, 624 F.3d at 1088-89

13          The court finds that "[r]easonable jurors could not [conclude] that . . . the physical

14   force used here was so unconscionable as to rise to the level of outrage, nor is there

15   evidence of severe emotional distress suffered by the plaintiff."  *Monetti*, 875 F. Supp. 2d

16   at 1231.  The conduct Mr. Roufa highlights as extreme enough to support an IIED

17   claim—hurting his wrists while removing the handcuffs, generally disregarding his

18   mental health, using several canisters of pepper spray to subdue him,[7] and placing him in

19

20          [7] Mr. Roufa argues that spraying four canisters of pepper spray into his cell constituted
       outrageous and extreme conduct.  (Resp. at 14.)  However, Mr. Roufa presents no evidence that
21     Officer Defendants actually emptied the four canisters of pepper spray into his cell.  (*See
       generally* Resp.; Dkt.).  Rather, the unrebutted evidence before the court is that Sergeant
22     Mohamed attempted to spray from four canisters of pepper spray but the first two canisters failed
       to deploy.  (*See* Resp. at 3 (citing generally Grant Decl., Mendez Decl., and Sprague Decl.).)

1    solitary confinement following the incident—does not rise to the level of provoking

2    someone to shout "Outrageous!" upon hearing of it.  *Christian*, 366 P.3d at 30.  In

3    addition, Mr. Roufa cites no case law or evidence in the record to support his argument

4    that such conduct is outrageous.  (*See id.* at 14-15.)  Further, even though Mr. Roufa does

5    not argue his testimony about Sergeant Mohamed's conduct toward him demonstrates

6    outrageous conduct that keeps his IIED claim alive, the court concludes that it would be

7    improper to determine that this testimony creates a genuine dispute of material fact that

8    precludes summary judgment.[8]  Mr. Roufa did not plead this conduct in his complaint,

9    and he cannot now add factual allegations to withstand summary judgment where

10   Defendants have met their burden.  Accordingly, Mr. Roufa's claim fails because

11   reasonable minds could not differ in concluding that the conduct Mr. Roufa alleges in his

12

13

14

---

15   Sergeant Mohamed therefore emptied only one full canister and one partial canister of pepper.
     (*See* 2d Mohamed Rep. at 2.)  The court cannot conclude on these facts that the amount of
     pepper spray Officer Defendants used amounted to outrageous and extreme conduct.

16        Further, the court is not required to scour the record to determine if there are additional
     facts that support either party's position.  *See In re Toyota Motor Corp. Unintended Acceleration

17   Mktg., Sales Practices, & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1093 n.66 (C.D. Cal. 2013)
     (noting that the party "failed to cite to evidence of record") (citing *Orr*, 285 F. 3d at 774-75);

18   *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, No. 2:06-CV-06229 FMC, 2009 WL 7464165, at *2
     (C.D. Cal. Feb. 18, 2009)).  Rather, the parties are expected to bring relevant facts to the court's

19   attention.

20        [8] The claim Mr. Roufa served on Defendants before filing this lawsuit mentioned that
     Sergeant Mohamed cut off Mr. Roufa's air supply and kicked him in the back of the head.  (*See*

21   Claim Form at 2-3.)  However, Mr. Roufa's complaint contained no such allegations, and the
     claim is not incorporated by reference into Mr. Roufa's complaint.  In addition, the claim itself is

22   not evidence.  Accordingly, Defendants did not have fair notice to defend against these
     allegations.  *See TFT-LCD Antitrust Litig.*, 2012 WL 5411590, at *2.

ORDER - 24

1  complaint and the undisputed facts before the court do not rise to the level of outrageous

2  conduct.[9]  *See Christian*, 366 P.3d at 30.

3        Mr. Roufa also does not present evidence of "severe emotional distress."  *Id.*  At

4  most, Mr. Roufa contends that he has experienced post-traumatic stress disorder and

5  "expects to have medical evidence ready to present at the time of trial, via expert

6  testimony, that Mr. Roufa has suffered a diagnosable emotional disorder as a result of his

7  treatment at the jail on June 9, 201[2]."[10]  (Resp. at 16.)  However, Mr. Roufa's

8  anticipation that he may procure evidence of an essential element of his case by the time

9  trial starts is insufficient to withstand summary judgment.  *See Celotex*, 477 U.S. at 324

10  (noting that if the moving party meets its burden, the nonmoving party must identify

11  specific facts from which a fact finder could reasonably find in his favor).  Because Mr.

12  Roufa lacks evidence that Defendants' conduct towards him was sufficiently outrageous

13  and that he suffered severe emotional distress as a result, the court grants Defendants

14  summary judgment on Mr. Roufa's IIED claim.

---

16        [9] Courts may consider whether to allow a plaintiff to amend his complaint when he raises
    new factual allegations and theories in response to a motion for summary judgment.  *See, e.g.*,
17  *Corona*, 2014 WL 11456535, at *5.  However, because the deadline to amend pleadings that the
    court set in its scheduling order has passed (Sched. Order (Dkt. # 7) (setting amendment deadline
18  for September 7, 2016)), Mr. Roufa must show good cause to amend his complaint, rather than
    simply that the liberal pleading standards of Federal Rule of Civil Procedure 15 are met, *see*
19  *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 610 (9th Cir. 1992).  Mr. Roufa has not
    attempted to demonstrate good cause, so the court does not consider whether amendment is
    permissible.  (*See generally* Resp.)

20        [10] The court notes that Mr. Roufa need not provide "evidence of objective
    symptomatology and medical diagnosis" to prevail on an IIED claim.  *See Kloepfel v. Bokor*, 66
21  P.3d 630, 632-33 (Wash. 2003).  Mr. Roufa must, however, provide evidence of outrageous
    conduct to show severe emotional distress, which Mr. Roufa has not done here.  *See id.* at 635
22  ("Once [extreme and outrageous conduct intended to cause emotional distress] ha[s] been shown,
    it can be fairly presumed that severe emotional distress was suffered."); (*see generally* Resp.).

1   **E.   Negligent Infliction of Emotional Distress**

2         A plaintiff may recover on a claim for NIED by proving negligent conduct, which

3   consists of the familiar elements of duty, breach, proximate cause, and harm, as well as

4   that the resulting emotional distress is (1) within the scope of foreseeable harm of the

5   negligent conduct, (2) a reasonable reaction given the circumstances, and (3) manifest by

6   objective symptomatology. *Schmidt v. Coogan*, 335 P.3d 424, 430 (Wash. 2014); *Kumar*

7   *v. Gate Gourmet Inc.*, 325 P.3d 193, 205 (Wash. 2014); *Hunsley v. Giard*, 87 Wn.2d 424,

8   436, 553 P.2d 1096 (Wash. 1976) (stating requirement of objective symptomatology).

9   "The symptoms of emotional distress must also 'constitute a diagnosable emotional

10  disorder.'" *Kloepfel*, 66 P.3d at 633 (quoting *Hegel v. McMahon*, 960 P.2d 424 (Wash.

11  1998)).

12        A plaintiff, however, "may not base claims of negligence on alleged intentional

13  actions, such as excessive force or unlawful arrest." *Lawson v. City of Seattle,* No.

14  C12-1994MAT, 2014 WL 1593350, at *13 (W.D. Wash. Apr. 21, 2014) (granting

15  summary judgment on an NIED claim predicated on the intentional acts underlying the

16  plaintiff's false arrest claim); *see also St. Michelle v. Robinson*, 759 P.2d 467, 470 (1988)

17  ("[T]he abuse was an intentional act, and the resulting emotional distress was also

18  intentionally inflicted as a matter of law.  Therefore, St. Michelle cannot state a cause of

19  action for the negligent infliction of emotional distress."); *Willard v. City of Everett,* No.

20  C12-0014TSZ, 2013 WL 4759064, at *2 (W.D. Wash. Sept. 4, 2013) ("A plaintiff may

21  not base a claim of negligence on an intentional act, like the use of excessive force."); *Nix*

22  *v. Bauer,* No. C05-1329TSZ, 2007 WL 686506, at *4 (W.D. Wash. Mar. 1, 2007)

1 ("[A]llegations of intentional conduct cannot support a claim of negligence.") (citing

2 *Boyles v. Kennewick*, 813 P.2d 178 (Wash. 1991)).

3      Defendants contend that Mr. Roufa cannot prevail on his NIED claim because he

4 bases the claim on intentional conduct, rather than negligent conduct.  (MSJ at 17.)

5 Specifically, Defendants argue that "the gist of this case is alleged excessive force."  (*Id.*)

6 Defendants also argue that Mr. Roufa cannot establish the elements of an NIED claim,

7 even if he bases the claim on negligent conduct.  (*Id.* at 16.)

8      Mr. Roufa counters that "[i]f a jury did not find that [Defendants] intentionally

9 inflicted emotional distress, they could, on the same facts, reasonably find negligent

10 infliction of emotional distress."  (Resp. at 15.)  Mr. Roufa also states, without citation to

11 any specific evidence in the record, that he has established all of the elements of his

12 NIED claim.  (*See id.* (stating that Defendants owed Mr. Roufa a duty of care, that

13 Defendants breached the duty of care "when they completely disregarded and ignored

14 Mr. Roufa's medical condition and exercised force upon him rather than rendering aid,"

15 and that Mr. Roufa has suffered emotional distress within the scope of foreseeable

16 harm).)  Mr. Roufa also claims that he "expects to have medical evidence ready to

17 present at the time of trial, via expert testimony, that Mr. Roufa has suffered a

18 diagnosable emotional disorder as a result of his treatment at the jail on June 9, 201[2]."

19 (*Id.* at 16.)

20      The court concludes that Mr. Roufa's claim fails because he bases it on intentional

21 conduct.  For example, Mr. Roufa argues that "Defendants breached their duty" to Mr.

22 Roufa when they "exercised force upon him rather than rendering aid," and "Defendants'

use of force resulted in Mr. Roufa's severe injury and the emotional distress that followed." (Resp. at 15.)  It is therefore clear that Mr. Roufa's NIED claim is based on Defendants' intentional acts—their use of force against Mr. Roufa during his booking into King County Jail.  (*See* Compl. ¶¶ 26, 33, 38; Resp. at 3-4.)

However, even if Mr. Roufa's claim were based on negligent rather than intentional acts, Mr. Roufa fails to put forth evidence sufficient to withstand summary judgment.  Defendants have shown that Mr. Roufa has no evidence on which to proceed on essential elements of his claim, particularly that he has objective symptoms of a diagnosable emotional disorder as a result of Defendants' conduct.  (*See* MSJ at 16.)  In response, Mr. Roufa cites to no evidence in the record (*see* Resp. at 15-16) and expressly admits that he lacks evidence to demonstrate that he suffered emotional distress (*id.* at 16 (stating that Mr. Roufa expects to have evidence of a diagnosable emotional disorder by the time of trial)).  Mr. Roufa's legal arguments are not evidence, and the court is not required to wade through the record to find evidence to support Mr. Roufa's claims.[11] *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); *In re Toyota Motor Corp.*, 978 F. Supp. 2d at 1093 n.66 (noting that the party "failed to cite to evidence of record" (citing *Orr*, 285 F. 3d at 774-75)); *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, No. 2:06-CV-06229 FMC, 2009 WL

---

[11] Further, Mr. Roufa has not demonstrated that the "resulting emotional distress is (1) within the scope of foreseeable harm of the negligent conduct, [and] (2) a reasonable reaction given the circumstances." *Schmidt*, 335 P.3d at 430; (*see, e.g.*, Compl. ¶¶ 28 ("Later, upon a more thorough review of Mr. Roufa's chart, Nurse Gabriella indicated that there were in fact no medical reasons that Mr. Roufa could not be tased."), 30 (alleging that Sergeant Mohamed "made the decision to release Mr. Roufa from his secured cell in order to shower" in spite of Officer Mendez and Officer Sprague's objections).)

7464165, at *2 (C.D. Cal. Feb. 18, 2009).  Accordingly, the court dismisses Mr. Roufa's

NIED claim because Mr. Roufa has produced no evidence on essential elements of his

claim.

**F.     Disability Discrimination**

WLAD prevents discrimination in places of public accommodation on the basis of

a person's disability.  *See Fell v. Spokane Transit Auth.*, 911 P.2d 1319, 1323 (Wash.

1996).  To establish a prima facie case of disability discrimination, a plaintiff must prove

that

> (1) [he or she has] a disability recognized under the statute; (2) the
> defendant's business or establishment is a place of public accommodation;
> (3) [he or she was] discriminated against by receiving treatment that was
> not comparable to the level of designated services provided to individuals
> without disabilities by or at the place of public accommodation; and (4) the
> disability was a substantial factor causing the discrimination.

*Id.* at 1328.  Public accommodations encompass "places and facilities," not services.  *See*

*id.* at 1329 (noting that places of public accommodation include "restaurants, parks and

public resorts, movie theaters, a weight control clinic, and barbershops").  Defendants

argue that they are entitled to summary judgment on Mr. Roufa's disability

discrimination claim because jails are not places of public accommodation under the

statute, and that even if jails are places of public accommodation, "[Mr.] Roufa fails to

identify who failed to accommodate him and what accommodations were denied."  (MSJ

at 17.)  Mr. Roufa argues that the term "public accommodation" is to be interpreted

expansively under WLAD and that what constitutes a place of public accommodation is a

question for the trier of fact.  (Resp. at 10 (citing *Fraternal Order of Eagles, Tenino Aerie*

1  *No. 564 v. Grand Aerie of Fraternal Order of Eagles*, 59 P.3d 655 (Wash. 2002), and

2  *Fell*, 911 P.2d at 1319)).

3      Although Washington State courts have not addressed the issue, the District

4  Courts for the Western and Eastern Districts of Washington have concluded that jails are

5  not places of public accommodation under WLAD.  *See Vega v. United States*, No.

6  C11-0632RSM, 2012 WL 5384735, at *12 (W.D. Wash. Nov. 1, 2012) ("To this date, no

7  Washington case has applied WLAD to a prisoner's treatment by a jail or residential

8  treatment center because they are not places of public accommodation."); *Kral v. King

9  Cty.*, No. C10-1360MAT, 2012 WL 726901, at *17 (W.D. Wash. Mar. 6, 2012)

10  (concluding that even if the plaintiff's claim were "more broadly construed" to identify

11  King County correctional facilities as places of public accommodation, plaintiff's claim

12  failed because such facilities are not considered places of public accommodation under

13  WLAD); *Foley v. Klickitat Cty.*, No. C08-3068JPH, 2009 WL 5216992, at *6 (E.D.

14  Wash. Dec. 30, 2009) ("Plaintiff offers no basis for this Court to conclude a county jail is

15  a place of public accommodation under the WLAD."); *Kral v. Benton Cty.*, No.

16  C09-5014RHW, 2009 WL 3856918, at *4 (E.D. Wash. Nov. 10, 2009) ("The Court finds

17  that extending RCW 49.60.215 to courthouses and jails would be a significant and wholly

18  unsupported leap from the types of facilities identified in the case law to date."); *Brown

19  v. King Cty. Dep't of Adult Corr.*, No. C97-1909W, 1998 WL 1120381, at *16-17 (W.D.

20  Wash. Dec. 9, 1998) (stating that the WLAD's statutory definition "strongly suggests that

21  a 'place of public . . . accommodation' does not encompass a prison environment[,]" and

22  finding no basis to conclude a county jail constituted "a place of 'public accommodation'

1    under RCW § 49.60.215").  Based on these authorities, Defendants have met their burden

2    of negating an essential element of Mr. Roufa's case—that the alleged discrimination

3    occurred in a place of public accommodation.  *See Fell*, 911 P.2d at 1328.  The

4    undersigned judge finds no compelling reason to depart from the reasoning of the many

5    judges in the Western and Eastern Districts who have concluded that jails are not places

6    of public accommodation.  *Vega*, 2012 WL 5384735, at *12; *Kral*, 2012 WL 726901, at

7    *17; *Foley*, 2009 WL 5216992, at *6; *Kral*, 2009 WL 3856918, at *4; *Brown*, 1998 WL

8    1120381, at *16-17.

9           Mr. Roufa further contends that "[t]he fact that jail health services are run by

10   'Public Health of King County,' and that the jail has finally implemented a disability

11   accommodation policy is further evidence that [the jail] is a place of public

12   accommodation."  (Resp. at 10.)  However, Mr. Roufa's contention that King County's

13   adoption of a disability policy for its jail demonstrates that the jail is a place of public

14   accommodation flouts WLAD's statutory language and Washington case law, which

15   strongly suggests that services do not amount to places of public accommodation.  *See*

16   *Fell*, 911 P.2d at 1329.  Further, Mr. Roufa's citation to *Fraternal Order of Eagles* to

17   support his argument for an expansive definition of public accommodation is inapt.  (*See*

18   Resp. at 10.)  In *Fraternal Order of Eagles*, the Washington Supreme Court considered

19   the meaning of the phrase "fraternal order" in WLAD and did so in part by considering

20   the legislative purpose of WLAD—"to deter and eradicate discrimination in

21   Washington."  *Fraternal Order of Eagles*, 59 P.3d at 667; *see also id.* at 662 (construing

22   the meaning of "fraternal organizations," which were exempt from the definition of

1    public accommodation).  The Court was not considering the general definition of public

2    accommodation as Mr. Roufa suggests it was.  *Id.* at 662, 667; (*see also* Resp. at 10.)

3    Because Mr. Roufa has failed to demonstrate that he was discriminated against in a place

4    of public accommodation, Mr. Roufa's disability discrimination claim under WLAD fails

5    as a matter of law.[12]

6    **G.    Respondeat Superior**

7           The doctrine of respondeat superior "imposes liability on an employer for the torts

8    of an employee who is acting on the employer's behalf."  *Niece*, 929 P.2d at 426.

9    Respondeat superior, however, "is not an independent cause of action."  *Zellmer v.*

10   *Constantine*, No. C10-1288MJP, 2015 WL 1611939, at *3 (W.D. Wash. Apr. 9, 2015);

11   *Fulbright v. Dayton Sch. Dist. No. 2*, No. C13-0030TOR, 2013 WL 1497388, at *6 (E.D.

12   Wash. Apr. 10, 2013) ("Respondeat superior . . . is a theory of liability rather than a

13   separate cause of action." (citing *Hollinger v. Titan Capital Corp,* 914 F.2d 1564,

14   1576-77 n.28 (9th Cir.1990))).

15          Although Defendants admit that the Officer Defendants acted within the scope of

16   their employment, they argue that this claim fails as a matter of law because respondeat

17   superior is not a "separate cause of action."  (MSJ at 17.)  Mr. Roufa does not address

18   Defendants' argument or otherwise advance his own argument on this claim.  (*See* Resp.)

19   //

20   //

21          _____

       [12] The court does not address Defendants' other arguments related to this claim because
22   the court finds that King County Jail was not a place of public accommodation as a matter of
       law.

ORDER - 32

1    The court grants Defendants' motion for summary judgment on Mr. Roufa's claim

2    because to the extent Mr. Roufa intends to assert a standalone respondeat superior claim,

3    the law does not recognize it.[13]  *See Zellmer*, 2015 WL 1611939, at *3.

4    **H.    Section 1983 Violations for Failure to Train and Supervise and for Use of
       Excessive Force**

5        "Section 1983 provides a remedy for violations of rights secured by the

6    Constitution by persons acting under the color of state law." *Kirkpatrick v. Cty. of*

7    *Washoe*, --- F.3d ---, 2016 WL 7176654, at *3 (9th Cir. Dec. 9, 2016) (citing 42 U.S.C.

8    § 1983).  Local governmental units may be sued under Section 1983, "but to prevail on a

9    claim against a municipal entity for a constitutional violation, a plaintiff must also show

10   that his or her injury is attributable 'to official municipal policy of some nature.'" *Id.*

11   (quoting *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691 (1978)).  To establish a

12   municipal policy, "a plaintiff must show a constitutional right violation resulting from (1)

13   an employee acting pursuant to an expressly adopted official policy; (2) an employee

14   acting pursuant to a longstanding practice or custom; or (3) an employee acting as a final

15   policymaker." *Delia v. City of Rialto*, 621 F.3d 1069, 1081-82 (9th Cir. 2010) (internal

16   quotation marks and citation omitted).  A policy "causes an injury where it is the moving

17   force behind the constitutional violation." *Chew v. Gates*, 27 F.3d 1432, 1444 (9th Cir.

18   1994) (internal quotations omitted).

19   //

20

21   ──────────────────────

      [13] Although Mr. Roufa could advance a respondeat superior theory of liability for Officer
22   Defendants' alleged torts, the court has dismissed Mr. Roufa's tort claims against Defendants.
      *See supra* §§ III.B-E.

1    Section 1983 claims may be brought against officers in their official or individual

2  capacities.  An action against an officer in his official rather than individual capacity is

3  "treated as a claim against the entity itself."  *Bryant v. Lovick*, No. C09-1565TSZ, 2010

4  WL 1286791, at *5 (W.D. Wash. Mar. 25, 2010) (citing *Kentucky v. Graham*, 473 U.S.

5  159, 166 (1985)); *cf. Graham*, 473 U.S. at 165 ("Personal-capacity suits seek to impose

6  personal liability upon a government official for actions [an official] takes under color of

7  state law.").  "Because the real party in interest in an official capacity suit is the

8  governmental entity and not the named official, to establish municipal liability the

9  plaintiff must show that the entity is a moving force behind the deprivation or that the

10  entity's policy or custom played a part in the violation of federal law."  *Low v. Stanton*,

11  No. CIV S-05-2211 MCE DAD P, 2009 WL 595985, at *3 (citing *Graham*, 473 U.S. at

12  166).  To hold a supervisor individually liable "[w]here the constitutional violations were

13  largely committed by subordinates," the supervisor must have participated in or directed

14  the violations.  *Humphries v. Cty. of L.A.* 554 F.3d 1170, 1202 (9th Cir. 2009) *rev'd on*

15  *other grounds by L.A. Cty., Cal. v. Humphries*, 562 U.S. 29 (2010).

16    1.  Failure to Train and Supervise

17    Mr. Roufa seeks to hold King County, Executive Constantine, and Supervisory

18  Defendants liable for failing to train or for inadequately training Officer Defendants.

19  (*See* Compl. at 10.)  Although it is unclear from Mr. Roufa's complaint whether he

20  alleges this claim against Supervisory Defendants and Executive Constantine in their

21  official or individual capacities (*see* Compl. at 10 (listing defendants against whom this

22  claim is asserted), 13 (seeking damages)), the court construes Mr. Roufa's complaint as

1   suing these defendants in their individual capacities absent an indication to the contrary,

2   *see Shoshone-Bannock Tribes v. Fish & Game Comm'n*, 42 F.3d 1278, 1284 (9th Cir.

3   1994) ("Where state officials are named in a complaint which seeks damages under 42

4   U.S.C. § 1983, it is presumed that the officials are being sued in their individual

5   capacities.").

6          *a.   King County and DAJD*

7         "A failure to train or inadequate training may form the basis for municipal liability

8   under § 1983 where the training or failure to train amounts to deliberate indifference to

9   the rights of the persons with whom the municipality's employees come into contact."

10  *Flores v. Cty. of L.A.*, 758 F.3d 1154, 1158 (9th Cir. 2014).  To establish a failure to train

11  claim against a municipality, the plaintiff "must show that (1) he was deprived of a

12  constitutional right, (2) the City had a training policy that amounts to deliberate

13  indifference to the [constitutional] rights of the person with whom [its officers] are likely

14  to come into contact; and (3) his constitutional injury would have been avoided had the

15  City properly trained those officers."  *Blankenhorn v. City of Orange,* 485 F.3d  463, 484

16  (9th Cir. 2007) (internal quotations omitted).

17        A municipality is deliberately indifferent "when the need for more or different

18  action is so obvious, and the inadequacy [of the current policy] so likely to result in the

19  violation of constitutional rights, that the policymakers . . . can reasonably be said to have

20  been deliberately indifferent to the need."  *City of Canton v. Harris*, 489 U.S. 378, 390

21  (1989); *see also Mortimer v. Baca*, 594 F.3d 714, 723 (9th Cir. 2010); *McFarland v. City*

22  *of Clovis*, 163 F. Supp. 3d 798, 802 (E.D. Cal. 2016).  "'[D]eliberate indifference' is a

1   stringent standard of fault, requiring proof that a municipal actor disregarded a known or

2   obvious consequence of his action.'"   *Connick v. Thompson,* 653 U.S. 51, 62 (2011)

3   (quoting *Bd. Of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 410 (1997)).

4   Further, a "pattern of similar constitutional violations by untrained employees is

5   ordinarily necessary to demonstrate deliberate indifference." *Id.* (citation omitted).

6           The Ninth Circuit Court of Appeals recently reaffirmed that although it is

7   "ordinarily necessary for a plaintiff to demonstrate a pattern of similar constitutional

8   violations by untrained employees" to prove "that the municipality was on notice of a

9   constitutionally significant gap in its training," "evidence of a pattern of constitutional

10  violations is not always required to succeed on a *Monell* claim." *Kirkpatrick*, 2016 WL

11  7176654, at *7 (internal quotations omitted).  In "rare" circumstances, "a particular

12  'showing of "obviousness" can substitute for the pattern of violations ordinarily

13  necessary to establish municipal culpability.'"  *Id.* (quoting *Connick*, 563 U.S. at 63).

14  Nevertheless, "a single constitutional incident, without more," does not "establish that a

15  municipality failed to provide proper training."  *Id.* at *9.

16          Mr. Roufa alleges that King County, DAJD, Executive Constantine, and

17  Supervisory Defendants failed to train and adequately supervise Officer Defendants in

18  their interactions with people with mental health disabilities.  (Compl. at 10.)   As to King

19  County and DAJD, Defendants contend that Mr. Roufa "does not sufficiently identify any

20  custom or policy of King County that led to [Mr. Roufa's] alleged deprivation," "does not

21  identify any particular omission in King County's policies," or establish that "King

22  County had actual or constructive notice of any particular omission in its policies."  (MSJ

1   at 20 (emphasis omitted).)  Defendants further argue that Mr. Roufa "alleges no facts

2   indicating that this alleged failure to train rises to the level of an official government

3   policy for purposes of [Section] 1983." (*Id.*)

4       In response, Mr. Roufa argues that he has established a prima facie showing of

5   failure to train and supervise.  (Resp. at 11.)  He contends that "[t]here is not one mention

6   of any policy or training relating to the care of mental health patients anywhere in the jail

7   incident report" and that the jail did not enact a disability accommodation policy until

8   2016.  (*Id.*)  Mr. Roufa further contends that the fact that the jail's investigation

9   concluded that the officers "acted within the scope of jail policy" establishes that in 2012

10  the jail had "a policy of indifference in regards to managing mental health patients in

11  crisis at the jail, including Mr. Roufa." (*Id.* at 12.)

12      The court concludes that Mr. Roufa's claim for failure to train and supervise as to

13  King County and DAJD fails as a matter of law.  When a plaintiff alleges that a

14  municipality's omission caused its employees to commit a constitutional violation, "the

15  plaintiff must show that the municipality's deliberate indifference led to its omission and

16  that the omission caused the employee to commit the constitutional violation." *Gibson v.*

17  *Cty. of Washoe, Nev.,* 290 F.3d 1175, 1186 (9th Cir. 2002).  "Only then can such a

18  shortcoming be properly thought of as a city policy or custom that is actionable under

19  § 1983." *Connick,* 131 S. Ct. at 1359-60 (internal citation and quotation omitted).  Mr.

20  Roufa has presented no evidence of a "pattern of similar constitutional violations" or that

21  the lack of a policy will obviously lead to constitutional violations and thereby "substitute

22  for the pattern of violations." *Kirkpatrick*, 2016 WL 7176654, at *7; (*see* Resp.).  His

1   legal argument without any citation to record evidence is insufficient to withstand

2   summary judgment.[14]  *See Estrella v. Brandt*, 682 F.2d 814, 819-20 (9th Cir. 1982)

3   ("Legal memoranda . . . are not evidence . . . .").  Mr. Roufa also provides no evidence

4   showing that an omission caused Defendant Officers to commit a constitutional

5   violation—that is, "that the alleged omission was the moving force behind the alleged

6   constitutional violation or that [King County] could have prevented the alleged violation

7   through an appropriate policy."  *Contreras v. City of Des Moines*, No. C11-0326JLR,

8   2012 WL 627993, at *6 (W.D. Wash. Feb. 27, 2012); *see also Chew*, 27 F.3d at 1444;

9   (*see* Resp.).  In the absence of evidence to support these elements, Mr. Roufa's claim

10   under Section 1983 for failure to train fails as a matter of law.

11                    *b.  Executive Constantine and Supervisory Defendants*

12              Defendants also argue that Mr. Roufa similarly fails to identify any policy

13   decisions sufficient to impose liability on Executive Constantine or Supervisory

14   Defendants in their individual capacities.  (MSJ at 20.)  Defendants argue that this claim

15   fails as to these Defendants because a plaintiff cannot recover against an officer's

16   supervisor on a theory of respondeat superior.  (*Id.* at 21.)  Rather, Defendants contend

17   that to prevail on a claim "against any individual defendant, [a] plaintiff must . . . show[]

18   that the individual defendant participated in or directed the alleged violation, or knew of

19   the violation and failed to prevent it."  (*Id.* (citing *Holcomb v. Burnett*, No.

20   _____

          [14] In addition, Defendants present evidence that King County in fact had a policy

21   regarding inmates with mental health disabilities at the time of Mr. Roufa's booking.  (2d
     Zeldenrust Decl. (Dkt. # 33), Ex. 4 (attaching DAJD Use of Force Policy Effective on October

22   25, 2010).)  Mr. Roufa did not address this policy in his response or assert that anything is
     omitted from it.  (*See* Resp.)

1   C14-5087RBL-KLS, 2014 WL 1931179, at *2 (W.D. Wash. 2014)).)  Mr. Roufa does not

2   address this particular argument in his response.  (*See* Resp. at 11-12.)

3        "To the extent [a plaintiff's] allegations against the heads of the sheriff and police

4   departments are premised solely on the responsibility of those individuals to supervise

5   police, sheriff, and/or jail employees alone, such allegations are insufficient to state a

6   § 1983 [claim]."  *Holcomb*, 2014 WL 1931179, at *2.  A plaintiff must instead prove that

7   each government official, through his own actions, violated the Constitution.  *Id.*  An

8   official's individual liability "depends on whether he 'set in motion a series of acts by

9   others, or knowingly refused to terminate a series of acts by others, which he knew or

10  reasonably should have known, would cause others to inflict the constitutional injury.'"

11  *Marshall v. Hertzog*, No. C12-1335JCC, 2013 WL 3977137, at *7 (W.D. Wash. Aug. 2,

12  2013) (citing *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998)).

13       Mr. Roufa alleges in his complaint that these defendants "were the responsible

14  parties for supervising the training, instructions, discipline, control, conduct[,] and hiring

15  of jail guards."  (Compl. ¶¶ 4-6; *see also id.* ¶ 10 (stating that Executive Constantine was

16  "responsible for the promulgation of rules and administration of the King County Jail").)

17  Mr. Roufa does not plead, however, that these defendants' own actions amounted to

18  constitutional violations.  (*See generally id.*)  In addition, he offers no evidence in

19  response to Defendants' motion for summary judgment to show that his claim against

20  these defendants is based their own constitutional violations, rather than on a failure to

21  adequately train Officer Defendants.  (*See* Resp.)

22  *//*

1    Despite Mr. Roufa's failure to respond to this argument, the court nevertheless

2    examines the record to determine if Defendants have met their summary judgment

3    burden.  Of the defendants whom Mr. Roufa sues for failure to train in their individual

4    capacities, the court finds nothing in the record to support liability against Executive

5    Constantine, Major Hyatt, Captain Clark, or Commander Karlsson on this theory.  (*See*

6    *generally* Compl.; Resp.)  They were not present at the time of the incident, and there is

7    no indication that they acted in their individual capacities to allegedly deprive Mr. Roufa

8    of his constitutional rights.  (*See* Compl.; Resp.; Hyatt Decl., Exs. 1-3.)

9    Indeed, only Captain Allen and Captain Woodbury were present at the June 9,

10   2012, incident.  (*See* 1st Mohamed Rep. at 2-3; 2d Mohamed Rep. at 3.)  According to

11   the evidence before the court, Captain Allen authorized Sergeant Mohamed to use

12   reasonable and necessary force in dealing with Mr. Roufa during Mr. Roufa's manic

13   episode, and later told Sergeant Mohamed to use a video camera during Mr. Roufa's

14   move to the dayroom.  (*See* 1st Mohamed Rep. at 3.)  Captain Woodbury arrived to the

15   dayroom shortly before the extraction team entered to remove Mr. Roufa, and Captain

16   Woodbury authorized Sergeant Mohamed to order the extraction team to enter the

17   dayroom without waiting for the video camera.  (*See* 2d Mohamed Rep. at 3.)  From

18   these uncontested facts, the court cannot reasonably infer that Captain Woodbury or

19   Captain Allen "'set in motion a series of acts by others, or knowingly refused to terminate

20   a series of acts by others, which he knew or reasonably should have known, would cause

21   others to inflict the constitutional injury.'"  *Marshall*, 2013 WL 3977137, at *7 (quoting

22   *Watkins*, 145 F.3d at 1093).

1    For these reasons, Mr. Roufa's failure to train and supervise claim is dismissed as

2    to all defendants against whom Mr. Roufa alleges it.

3       2.  Excessive Force

4       Mr. Roufa brings a Fourth Amendment excessive force claim "[a]gainst all named

5    defendants in their official capacities."[15]  (Compl. at 9.)  Although courts presume that

6    Section 1983 suits are brought against officers in their individual capacities, *see*

7    *Shoshone-Bannock Tribes*, 42 F.3d at 1284, a complaint rebuts this presumption when it

8    specifically designates named officers as individual or official defendants, *cf. id.*

9    ("[W]here the plaintiff fails to specify in the body of the complaint the capacity in which

10   suit is brought against the defendants, we hold that what is, and is not, expressly stated in

11   the caption controls."); *Stoner v. Santa Clara Cty. Office of Educ.*, 502 F.3d 1116, 1123

12   (9th Cir. 2007) (citing *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985) (Where a

13   complaint does "not clearly specify whether officials are sued personally, in their official

14   capacity, or both," the course of proceedings "typically will indicate the nature of the

15   liability sought to be imposed.")); *Arkens v. Cty. of Sutter*, No. 2:16-00951 WBS KJN,

16   2016 WL 4001057, at *2 (July 25, 2016) (stating that courts "look[] to the substance of

17   the plaintiff's claim, the relief sought, and the course of proceedings to determine the

18   nature of a [] suit" (internal quotation marks omitted)).  Because Mr. Roufa explicitly

19   states that his excessive force claim is "[a]gainst all named defendants in their official

20   capacities" (Compl. at 9), the court construes his claim in that manner.

21   _____

22      [15] It is not clear to the court why Mr. Roufa brought his excessive force claim against Officer Defendants in their official rather than individual capacities.

1          Here, Defendants argue that because Mr. Roufa sued all of the named defendants

2    in their official capacities, he must establish that the entity's policy or custom contributed

3    to the constitutional violation.  (MSJ at 21.)  In response to Defendants' argument, Mr.

4    Roufa contends that there is "ample evidence" to show that King County had a policy of

5    allowing officers to use excessive force in dealing with mentally ill inmates.  (Resp. at

6    14.)  Because of the officers' actions in pepper spraying Mr. Roufa and in extracting him

7    from the dayroom, Mr. Roufa argues that "[a] reasonable jury could conclude, based

8    upon the evidence, that King County, specifically the King County Jail, has policies and

9    practices that violate 42 U.S.C. § 1983."  (*Id.*)  He states that "evidence of unnecessary

10   force and a municipality's indifference to officers' conduct can at times be inferred by an

11   agency's blind acceptance of reports authored by officers who have used significant and

12   excessive force against individuals [who] have done nothing wrong."  (*Id.* at 13.)

13          Although Mr. Roufa alleges that DAJD had "a departmental policy or custom of

14   resorting to the use of excessive force," *Larez v. City of L.A.*, 946 F.2d 630, 647 (9th Cir.

15   1991), and states that there is "ample evidence" (Resp. at 14), Mr. Roufa provides no

16   evidence of such a policy or custom, relying instead on his own argument (*id.*).  Courts in

17   the Ninth Circuit dismiss excessive force cases against officers in their official capacities

18   when plaintiffs lack evidence of a policy, custom, or practice.  *See Williams v. Richey*,

19   No. CV 09-327-DOC (AGR), 2010 WL 3075715, at *9 (C.D. Cal. June 4, 2010)

20   (recommending grant of summary judgment where plaintiff did not "identify an

21   unconstitutional use of force policy, custom[,] or practice that led to a violation of his

22   constitutional rights"); *Dang v. Cross*, No. CV00-130001GAF(RZX), 2002 WL

1    31368991, at *6 (C.D. Cal. October 16, 2002) (granting summary judgment on official

2    capacity claim because the plaintiff had not "shown that [the defendant] designed or

3    condoned any practices designed to deprive federal rights"); *contra Fuller v. City of*

4    *Orange*, 276 F. App'x 675, 679 (9th Cir. May 2, 2008) (reversing grant of summary

5    judgment in favor of sheriff acting in his official capacity where the plaintiff "introduced

6    a report that was prepared by a criminal justice consultant" who "detailed concerns

7    regarding the use of force by jail personnel during the time period relevant to the instant

8    case").

9         Mr. Roufa also provides no legal authority for his proposition that a policy may

10   "at times be inferred by an agency's blind acceptance of reports authorized by officers"

11   who have allegedly used excessive force. (*See* Resp. at 13-14.)  To the extent Mr. Roufa

12   intends to argue that Supervisory Defendants took insufficient remedial steps after the

13   June 9, 2012, incident, his claim also fails.  Mr. Roufa has not presented sufficient

14   evidence of a "policy or custom from the failure of [Supervisor Defendants] to take any

15   remedial steps after the alleged violations." *Larez*, 9446 F.2d at 647.  Indeed, the

16   evidence before the court shows that Major Hyatt and Captain Woodbury investigated the

17   incident after it occurred and took remedial steps to address the use of force. (*See* Clark

18   Rep at 2; Hyatt Decl. ¶ 2, Ex. 1; Hyatt Decl. ¶ 4, Ex. 2.)  Mr. Roufa has therefore failed to

19   present evidence showing there is a genuine dispute of material fact as to his excessive

20   force claim against defendants in their official capacities.[16]

21   _____

22        [16] When evaluating Fourth Amendment claims of excessive force, courts inquire
     "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances

1

## IV.    CONCLUSION

2          For the foregoing reasons, the court GRANTS Defendants' motion for summary

3   judgment (Dkt. # 12) and DISMISSES Mr. Roufa's claims WITH PREJUDICE.

4          Dated this 11th day of January, 2017.

5

6

7                                                      _____
                                                       JAMES L. ROBART
8                                                      United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20   _____

21   confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The court does not address
     whether Officer Defendants used unconstitutionally excessive force because Mr. Roufa brought
22   this claim against Officer Defendants in their official capacities and fails to present sufficient
     evidence of an applicable municipal policy, custom, or practice.

ORDER - 44